Case numbers 251734 and 251756, Brian Zimmermann et al versus Scott Labish et al. Or arguments not to exceed 20 minutes for plaintiffs and 10 minutes per defendant. Mr. Surowiec, you may proceed for the appellant. Good morning. Good morning. Thank you. I'll put my readers on here and begin. May it please the court. My name is James Surowiec and I represent the defendant appellants, Deputy Scott Labish, who is a Macomb County Sheriff's Deputy. I also represent Macomb County, who is being sued in a Monell claim. Deputy Labish is seeking legal aid for his review of a denial of his qualified immunity motion and the claim that he's seeking that I will be talking most about today is a state-created danger 14th Amendment claim brought under 42 U.S.C. 1983. This is a very tragic case. It's very sad. It involves a suicide death of a 14-year-old student who was a freshman in high school. I'm going to refer to him as J.P.Z. because those were his initials and he's a minor. I know that there's been others, the plaintiff has referred to him by name, but that's how I did it in my brief, so I'm going to follow that. He was a freshman in high school and he was described in the complaint as well-adjusted, friendly. He was high-functioning, athletic. He was a student-athlete and he had a goal of getting all A's. He also had ADHD. The case that brings us here today, it happened on October 4th, 1983. It's a state-created crime. He was a student-athlete. He was involved in a fight. He was called down to the principal's office and he was in the principal's office at which time he was informed he was suspended. His mother was contacted. His mother arranged to have his grandmother come and pick him up. Grandmother came to pick him up and he went home and several hours later he ended up committing suicide in the hospital. The allegations against Deputy Labish, he's a school resource officer and he works for a Romeo Community School district, but he's a Macomb County Sheriff's Deputy. I know this isn't a part of the record, but he's got four kids in the district and his wife's a teacher there, so he's a part of the community. The allegations against Deputy Labish we'll accept as true because that is what is required in order to get jurisdiction to the Sixth Circuit. He disagrees with them, he would disagree with them, he would disagree with them, but he disputes them, but we are accepting them. How often is your client at the school? Is this like 9 to 5 or just periodically? I think he's there during school hours. Every day? Every day. Did he know that JPZ had ADHD? It doesn't indicate, so I'm going to go by the complaint. It doesn't indicate that and the answer is no, he didn't. I mean, I don't even know that he knew JPZ, how well he knew him. I mean, there's hundreds of kids in a school district and we're talking about community schools from first all the way to high school and I can't say, I think he was the resource officer for the high school, but there's so many kids there. The allegations are that... We know a lot. This is the whole thing Judge Griffin said at the beginning. We know the facts and all this. There's this policy that your client referred to and there's not a lot about that in the complaint, so I know we're probably bound a little bit, but is there a three strikes law and did your client, did he describe it correctly? You know, that's what they're alleging, so we'll accept that as true. No, we didn't, but that's what they're alleging. We have to accept it as true because we moved under 12C. What policy was this? I have no idea. It sounded like a scared straight speech. So the policy that your client allegedly referred to, you're not sure if it's a school policy or a state policy? Again, this is a complaint that was filed three times, this third iteration. It was hundreds of paragraphs to begin with, but the dad drafted it initially, plaintiff's counsel who is pro bono and redrafted it. I know, I know all this, but the policy? I don't know. Okay, well that's your friend on the other side as well. He's accused of using harsh words, scaring the kids, saying you're going to go to jail if this happens again. You get into another fight, you're going to jail, and then there's an allegation that he secluded him in a room. The officer secluded him in the room or that the principal did? The allegation that they're claiming, I'm sorry, the argument they're making is that he was secluded in a room by the officer. That's not what the complaint says. The complaint says the officer went to him and he was already in the room. Secluded by the principal? Exactly. What seclusion means, they put a great deal of emphasis on that in terms of school policy, when you're allowed to seclude a kid, when you're not. I don't know where that goes in this analysis. I don't think it really matters very much. Do I think it's reasonable for a police officer or a school administrator to take a kid who's been in a fight and put them in a room? I think that's a reasonable safety measure that doesn't rise to the level of a constitutional violation. But accepting it as true, you know, I don't have to accept it as true because the complaint says he was in the room, his grandmother shows up, he's waiting for law enforcement, and then Deputy Labish arrives. And he scares him, gives him the scared straight speech, and then he goes home and ends up committing suicide. This court has never held that there could be a state-created danger circumstance for a non-custodial suicide. It's never held that. The only thing this court has consistently held is that there is no recognized cause of action in that type of scenario. It also, you know, this all comes from DeShaney where it says the state has no obligation to protect citizens from a private harm from a third party. Here we have a suicide. The young man took his own life, so he's caused his own harm. There's that problem. But aside from that, you know, we really don't have action from the deputy beyond mere words. Mere words. And I think, again, that's another reasonable tool that teachers and law enforcement have. It's probably like the last thing remaining, you know, that they have as a tool of discipline to keep order in the school. And I think it's reasonable if you're going to yell at someone. Has the Tenth Circuit spoken on the suicide question? Yeah, Armijo is the case, and it's a 26-year-old case, and it's frequently cited. It's a case where we have these facts. Armijo involved a kid who had some mental illnesses. He was known to be suicidal. He expressed suicidal ideations to a counselor. He was getting suspended from school. They drove him home. He previously said to the counselor in recent, you know, close to that day, I should just shoot myself. And they took him home without telling his parents, and he killed himself. We don't have that here. We have a kid being released to his grandmother. He goes home, and two hours later, he kills himself. We've not adopted that decision. We've mentioned it in one case, maybe an unpublished case. We haven't adopted that rule in our circuit. What's the practice for a clearly established analysis when someone's referring to a case that's not from the Supreme Court or from our circuit? We look to the Sixth Circuit. The clearly established law in the Sixth Circuit is there is no liability. There's no recognized constitutional tort for state-created danger for noncustodial suicides, if there is. But there really is. There's no clearly established law telling Deputy Labish that what he did violated the Constitution. That going to a classroom, to a room, and telling a kid, don't fight. And if you do, you're going to get in trouble. If you do, you're going to get in trouble. So he's not even saying that it's going to happen now. He's saying if you do it again, because that's the allegation in the complaint. The last most significant thing, and I would say this because I typically handle these cases in jail settings, where you have deliberate indifference because an inmate commits suicide. And there has to be knowledge that there's a subjectively perceived knowledge that there's a risk. You understand the risk, and you disregard it. Because you know this person's going to kill themselves, and that's where liability attaches. There's no allegation in the complaint that anyone knew. And that's why this court has said suicide is a difficult event to predict and prevent, and it occurs without warning. It's tragic. It's tragic what happened to this kid. I don't think the parents knew, the school didn't know, the deputy most certainly didn't know, and there was nothing that he did that violated this young man's 14th Amendment rights. I have nothing further. Thank you, counsel. Good morning. May it please the court, my name is Lindsay Hazen, and I represent appellants Melissa Arntz and Romeo Community School District. I've reserved two minutes for rebuttal. Appellants recognize the unimaginable loss the parents in this case have suffered. But this appeal asks a legal question that this court has answered several times. In John, in Cutlip, in Wilson. And that answer is that school officials do not commit a constant shocking constitutional tort when a student takes their own life at home hours later after a disciplinary meeting. So simply put, the question here is do school officials commit a constitutional violation when they discipline a student for getting in a fight? The answer to that I would put forward is no. Plaintiff seeks to convert a routine disciplinary meeting into a substantive due process violation, and that theory would impose 1983 liability on virtually every school official in this circuit whenever a disciplined student suffers some kind of later harm that they have no knowledge of. And that cannot be the law, and DeShaney and his progeny forecloses it. This court has addressed this precise issue in this context in John B. Farnsworth and found no liability. And most recently, this court addressed whether school officials' handling of student behavior issues violates the Constitution in France. The bottom line, this court has repeatedly said suicide cases are treated differently and dismissed each of them in turn. Did those prior cases look at the facts of the case and say that the facts did not arise to egregious conduct or conscious shocking conduct? In terms of whether it's summary judgment or a 12C motion? Well, just, I mean, you seem to be asking for a blanket rule that there's not a substantive due process violation for a noncustodial suicide. I mean, that's just a broad rule. And if that were the rule, we would not have to look at the specific facts. Yeah. I'm not saying that there's a situation that could never happen that would arise to that kind of conscious shocking conduct. Well, you are saying, you're leaving the door open, then, for. I mean, I don't think the door open is in this case. That's certainly no conscious shocking conduct in this case. You're saying you don't need that rule to win. Exactly. But there is, of course, a set of facts and circumstances where it could rise to that. And I think that's why this circuit hasn't foreclosed it entirely. But here, the district judge denied the motion to dismiss, saying that further discovery was necessary. And if the case rises and falls on the facts, don't we need to look at what further discovery might produce as to facts? We don't need to in this case, Your Honor. The complaint, as alleged, falls squarely within the four corners of John B. Farnsworth. So this court can dismiss as a matter of law. And if you look at Franz, that's also on a 12C motion, where we looked at a school official's response to student behavior and whether that was conscious shocking. And even when that court considered, maybe we could debate affirmative actions, but thus responding to student needs in this way is simply not conscious shocking. Every single day in schools, administrators, SROs collaborate, talk, hold disciplinary meetings, because that's what they have to do. It's what we expect them to do. If a student brings a gun to school, we expect them to respond to that and issue discipline. Every single day, I don't know that you have a principal and a school resource officer, according to the complaint, making the sort of affirmative statements that are attributed to Deputy Labiche here in terms of berating and intimidating the student, making representations about three strikes and possibly going to jail, things of that nature. That's not, I would think, an everyday occurrence in a school setting. Well, what I can say, Your Honor, is that Principal Arntz isn't accused of making any of those statements. But she's accused of not taking, essentially remaining silent. Right, but that's a failure to act. It's not an affirmative act under our case law. And what the lower court did, essentially, was transform presence into participation. And that's just not what our courts tell us to do. I would add that Plaintiff hasn't cited a case where this court has found a violation or liability under remotely close circumstances as well. And I'll focus just on the constant shocking component, because I think that that resolves everything for us here. This is a significant hurdle, and the behavior must be brutal and humane. Our case law requires knowledge of a specific risk of harm and action to ensure that specific risk comes true. The lower court's holding collapses general vulnerability into specific risk awareness. That's not law of the circuit. That's as held in Jackson, in McQueen. The risk known to Arntz was the risk of student on student fighting. And she responded to that risk with discipline. Did she know the student's disability? There's no allegation that she had any knowledge of any disability or ADHD. There's no, okay. Is there an allegation that this disability makes it more likely that the student would commit suicide? There's generalized allegations that this makes them more vulnerable, but a generalized vulnerability is not a specific risk that's needed for the constant shocking standard. She's charged with ignoring what was never known to her, and there's no allegation that she had any knowledge of suicidal ideations. In the sort of special danger analysis, we're supposed to sort of determine whether the district put the student in a worse position than sort of like comparable students, let's say. Who are the comparable student group here? I mean, is it just any student at the school, or is it a student who's gotten in a fight, in terms of like the special danger that the district has created? Who do we sort of, what's the baseline that we can hear? I believe the baseline for that is the student population, but if we're talking about, if we're, I'm not sure if your honor is asking about the specific vulnerability of this child, in terms of compared to other cases, or. Well, no, why isn't it, why isn't the comparator the students who've gotten in a fight? In other words, I don't think there's any allegation the district is just putting people in rooms and yelling at them if they haven't done anything wrong. So it seems to me the comparator here that your friend on your side is making is for students who get in a fight, you're not allowed, for some reason the Constitution prohibits you from putting those students in a room by themselves and secluding them. Yeah, and well I think with the seclusion issue itself, it seems like a fundamental misunderstanding of how Michigan law defines seclusion. As referenced in the complaint, he's citing a definition pursuant to the seclusion and restraint laws in Michigan, where the MDA gives us, MDE gives us specific guidance that telling a student to stay in a room is not seclusion per se. Every single day when kids get in trouble, they're told, wait here while your parents arrive, wait here while we come talk to you. So, I don't think that that even gets us that far to that conscience tracking standard. I'll just finish up for now, your honor, with bringing attention back to John, because I think that that gives us everything we need on both federal and state claims. This is a student who was accused of theft by administrators, threatened with felony charges, told his college would be notified, was walked to his car by an administrator, was weeping, and the administrator told dad, watch out for that boy. He was spoken to alone by three administrators in a room with no parent present, and he committed suicide later off campus. And this court affirmed dismissal of that case. The plaintiff called those actions routine and unobjectionable. If your honors have no further questions at this time, I'll reserve my time for rebuttal. Any further questions, Judge Cole, Judge Raidlin? All right, you'll have your two minutes rebuttal. Thank you. All right, let's hear from plaintiff's counsel. Good morning. Good morning, your honors. May it please the court, Nicholas Colson for plaintiff Applee, Mr. Zimmerman. The district court properly recognized in this case that while this case is not Yon or Cutlip, those cases demonstrate the framework that clearly establishes the constitutional right that the defendants violated. The cases that don't recognize the right actually set the parameters for what's clearly established? Yes, your honor. I think both the Supreme Court's jurisprudence from Hope and this court's interpretive cases regarding Hope make clear that a clearly established right can come from the reasoning, though not the holding, of a prior case. And so what happened throughout the Sixth Circuit's jurisprudence is that the state created danger has been recognized for more than – the exception has been recognized for more than 30 years since Kallstrom. It was applied then to suicide cases in Cutlip using the ordinary state-created danger factors. And then it was further applied to school-related suicide cases in Yon. Don't we need a case that's on similar facts where we've held that this violates the Constitution for it to be clearly established? No, your honor. It does not have – the cases do not have to be on all fours. They don't have to fit, as counsel suggests and I'll address in a moment, that – They have different facts and different holding. They have different facts and they can say there's no constitutional violation and that clearly establishes the facts that would amount to a constitutional violation. So as long as the court's reasoning is sufficient to put a reasonable actor on notice, that their actions would be violative of the constitutional right, that's all that's required, and the more egregious the conduct, the more clear that that becomes. The district court properly recognized here that the defendant's conduct was deliberately designed to terrorize a 14-year-old boy. That is egregious conduct and that's the kind of thing that any reasonable person in the shoes of a school administrator or a school resource officer would know. And so that's where it fits in. We know what the analysis is. It's this three-factor framework that requires affirmative acts that created or increased the risk of private violence and deliberate indifference to a known or obvious risk. Those are the factors and this court's been very clear that they continue to apply even in the school suicide setting, but this case is materially different than Yan in ways that I think – Can I ask you, does the complaint allege that either defendant knew that the student had ADHD? No, Your Honor. I gathered that that question was coming based on the court's questions to counsel. The complaint establishes that the school district certainly knew, but it's a fact-specific issue that we can't possibly know without access to discovery whether these two individual defendants knew about – They could allege upon reasonable belief or something, information belief. So the complaint does not allege that these two defendants knew? It does not, Your Honor. It does not. Not the two individual defendants. Does it allege that this condition leads to suicide or makes the student more susceptible to suicide? It does, Your Honor. Specifically through the vector of increased impulsivity and emotional reactivity. And so students and children with ADHD are more likely to have severe and harsh reactions. Do you know where in the complaint that's alleged? It would take me a moment, Your Honor. I don't have it offhand, but I'd be happy to look. That's all right. We'll find it if it's there. Thank you, Your Honor. The distinctions from Yan, though, make clear that this case is anything but fitting within the four quarters of Yan. So the deceased in Yan admitted to a crime. There was a legitimate interest in a criminal investigation and criminal consequences. Here we have maliciously fabricated threats. We have deceit and we have improper seclusion. And to correct the record on a couple of things, counsel for W. Labish and for the county stated that Joey was involved in a fight. That's simply an effort to recast the pleadings in a way that's inconsistent with the record before this court. Paragraphs 12 through 17 of the complaint make very clear that Joey was involved in an incident where, at worst, what he did was an accidental tripping of another student and his own principal described it to his mother as not a big deal. It was also that the complaint alleges that the kids get off the bus at the high school and then they get on another bus to go to the ninth grade academy. They keep them separate from the rest of the high schoolers. The incident was of sufficiently limited severity that they put him back on the next bus. They didn't even pull him off of the bus. And it was also of sufficiently limited severity. And we know that there was no legitimate criminal investigation or possibility of criminal action because Deputy Labish didn't make the report of the incident until more than two days later after Joey's death, after he was aware of Joey's death because he was at the scene. And so in Yon, we have an actual crime to which this student admitted. Here we have no crime, but we have the threat of utterly fabricated false criminal consequences. And I know that- But we have an incident. We have an incident, right? We do, Your Honor. We don't know the contours of an incident, but there's something there. Certainly. And at the 12B6 stage or at the motion for judgment on the pleadings context, the court's required to take all well-pled allegations in the complaint. What we allege is that he inadvertently tripped another student, which is inarguably not a criminal matter. Okay. But there's some kind of engagement, and this is the second time, right? There's some similar incident that happened before. Not a similar incident, Your Honor. We allege that there was an incident that led to Joey having a target on his back by Deputy Labish where all he was alleged to have done is to have filmed an incident involving other students. And Deputy Labish pressed Joey to- Okay. So the question I was getting at is the district has had to create a special danger for this student. And who are the comparator students? I think the comparator students should be students who have had two incidents and not just the general population. In other words, we don't just compare this student to how the general population gets treated because the general population did not have two incidents. So the baseline comparator has to be the two-incident student. Is that wrong? It's an interesting question, Your Honor, and one that until counsel was up here I hadn't considered deeply. But if you look at it as I briefly reviewed this court's jurisprudence on that particular element, I don't think it can be so narrowly defined. I think it has to be the students in general. And the reason being is that one context where this arises is like general motorists versus someone in a particular vicinity. If it was described that narrowly, so long as a government- It would be someone in a particular vicinity who's speeding. I'm sorry, Your Honor? It would be someone in a particular vicinity who's speeding. It's not just general motorists. It's general motorists who has had an incident. I think the serious problem there with that is that we have a student who has never committed a criminal act, who has- There's been two incidents. I agree on that. Maybe they're minor incidents. Maybe they're major incidents. I just think you have to take that into consideration when you're figuring out the comparable group. In other words, in your theory, if you bring a gun to school, a knife to school, a bomb to school, you have to compare how that student was treated to how a normal student who just walked into school that day was treated. That doesn't make sense to me. Certainly not, Your Honor. But I think the other elements of the state-created danger, for example, exception, will pick that up. I don't know that it's the general public versus the specific person's risk thing is where that most comes into play. And so you're saying if a student with two incidents, what is the district supposed to do in that circumstance? They're not supposed to just let the student go home, right? That would be pretty irresponsible. That's what they said they were going to do, Your Honor. That's what they specifically told Joey's mother that they were going to do. Well, they didn't. They called the guardian. They called his mother, and they said that she needed to come pick him up. Right, so they weren't going to. I mean, that was their first response. I'm just not sure what the district was supposed to do in this circumstance. It seems like keeping him at school was the right thing to do, which is what they did in the end. And they needed to address the situation in some way. Your Honor, I think there are a lot of ways that they could have addressed it. None of those are the things that they actually did. They just sent the student home, and then the student, that seems like a worse situation because the student's obviously amped up or something. So they gave him some cooling off period at school, some counseling. You're saying the counseling was too aggressive. Your Honor, I apologize, Your Honor. I'm just trying to, you know, there's a lot of different things the district could have done. This doesn't seem to be like a specially problematic approach. I can think of worse things the district could have done, not that that's the standard. I have a hard time thinking of worse things they could have done, Your Honor. Just sending him home on his own was one that struck me as that could be pretty problematic. That's another area where the allegations of the complaint have been recast in contravention of their plain language. They did not send him home with his grandmother. He fled from high school. No, that's not. Can the district be responsible for him fleeing? When they created the impetus for his fleeing, Your Honor, yes. The question Your Honor asked about what was this policy, this three strikes policy, we allege very clearly, and to the extent a 14-year-old would have any understanding of the sources of criminal law, that he was told that this was a criminal law, not a school policy, but that it was three strikes where he was going to be criminally prosecuted. If there's a third one. And he was, that's correct, Your Honor. He was told that he had two strikes, neither of which was even colorably a criminal offense, but that he was going to be mandatorily prosecuted, thrown out of school, and imprisoned. Imprisoned. There's absolutely no basis for a trained law enforcement officer to claim or believe whatever happened. If an officer pulls over a motorist and comes up to the motorist and says, I'm giving you a warning, but if you do this again, we're going to throw the book at you, does that create a special, is that a state-created danger for that motorist? Absolutely not, Your Honor. First of all, it wouldn't be a lie. Well, the officer is not the prosecutor. The officer doesn't know how the case will be prosecuted. So the officer is just, you know, giving a very significant warning that might be totally inconsistent with the state's motorist laws. Certainly, Your Honor. But the significant difference would be if the officer was deliberately terrorizing a person by knowingly making false threats of serious criminal consequences to a 14-year-old boy. This is an armed man with a badge and a gun and a scared, small 14-year-old child who didn't have the option to leave. And he was led to believe that his life was over that day. And so he acted like it was over. That's materially different than someone being threatened with the full consequences of their traffic violations, Your Honor. These criminal consequences were utterly fabricated. No reasonable person in law enforcement or, frankly, any grown adult that pays attention to our society would have believed that that was a criminal thing that this kid did. And it's completely at odds with what the school told his mother, saying that it was no big deal. I'm sorry, go ahead. I'm sorry, Your Honor. No, no, go ahead and finish. That's where we think it differs. And that's why I think that the rule, if this court affirms the district court, that this case would stand for, does nothing to interfere with ordinary school discipline. This was described as ordinary school discipline by counsel for the school district. And if this is ordinary school discipline, God help us. Look at ordinary school discipline. I guess we're focusing on the allegations of the complaint. Just in terms of timeline, I suppose it would be in the ordinary to take a student who's committed what appears to have been some sort of infraction and place them in seclusion. I mean, put them in a room by themselves. That in and of itself is not something that you're focusing on as inappropriate. It is inappropriate, Your Honor. I don't think it would give rise on its own to a constitutional violation. In isolation. But we do plead in our complaint that it's a violation of state law as well as the state's policy to seclude a student absent of emergency circumstances. And so having a minor altercation sometime before on the bus, this isn't like you're breaking up a fight in the middle of the hallway. And you've got to separate. And then what about the next step of calling a school resource officer to meet with or have some involvement in sort of that next step, meet with the student? Irrespective of what the allegations are in terms of what the officer said or didn't say. So we allege specifically that he was summoned to the room for the purposes of punishing, humiliating, and threatening the student, and that this was done pursuant to a policy of both the school district and the county. And we also allege that this has happened to numerous other children in the school. This is not a stand-alone incident. Well, okay. I'm just wondering what allegations support that he was summoned to intimidate, berate, you know, things of that nature, or assume in an ordinary context. There are times when a school resource officer is called in to meet with the principal and a student who has been charged with some sort of violation of school policy or something of that nature. So we also allege that that's inherently inappropriate, Your Honor, and there's guidance that states that a school resource officer should never be involved in matters of student discipline. And so when you have someone who's only supposed to be present in the context of either protective or criminal issues and they start making criminal threats, that adds to the egregiousness of the situation. And we do allege at paragraph 70 that defendant Ahrens wrongfully secluded Joey as in any justifiable emergency circumstances contacted Deputy Labish and requested he meet with Joey to punish, humiliate, and manipulate him, intentionally failed to disclose to Joey's parents that she was involving law enforcement, stood by and acquiesced to the severe punishment inflicted onto Joey, and failed to correct the lies stated by defendant Labish to manipulate the minor into thinking he could be criminally charged for non-criminal acts. That's helpful. So what's your best case here, given our Sixth Circuit precedent that extending the state-created doctrine to someone who unfortunately takes their life while they're not in the custody of the state, a suicide at home. What gets you to where you need to be here in terms of our precedent? I think it comes primarily from Jan, Your Honor, and specifically as the district court recognized the court in Jan's recognition of Armijo and the grounds upon which it distinguished the facts of Armijo from the facts at issue in Jan. And so that case stands for the proposition that the ordinary state-created danger factors apply and that if those factors are found in a particular case, the fact that it's a student suicide case does not mean that the state-created danger exception can't apply. If that was the case, all that the court would have had to do in Jan is say, this is a suicide case, they're off the hook, this isn't covered. And that's not what happened. They went through each of the three and they talked about the fact that there was no misconduct alleged on the part of the government actors. So one last question. So it appears that there's no allegation that either of these individuals knew of this student's diagnosis of ADHD. That's correct, the individual defendants. The individual defendants. So is knowledge to be imputed to them because the school district had record of that? In both cases, I think it should, Your Honor, and more strongly so probably for the principal, but for the school resource officer who's supposed to be interfacing with these students, particularly if he's going to insert himself in matters of routine student discipline. Is there a law that, I mean, what would support that sort of, imputing that sort of knowledge? Your Honor, in the constitutional context, I'm not sure I have anything. I mean, I would think of ordinary principles of agency, but in the constitutional context. I don't think that is the law. I think each defendant has to be judged separately, and they cannot have knowledge imputed to them. The other side argues that even accepting all your allegations and your complaint is true, it does not amount to a substantive due process violation because the conduct is not shocking to the conscience. Do you agree with that, that that's the standard we have to look, not only to see whether the conduct was inappropriate, but shocks the conscience? Yes, although, Your Honor, in this context, as we talk about in our briefing, it's a little bit more limited because where there is time to deliberate, the standard becomes more of a deliberate indifference standard. This is not something where law enforcement, for example, chasing someone who's fleeing has to make a snap, split-second decision, and so it has to be deliberate indifference. They have to be able to draw the risk of the harm and draw that risk, which can be inferred from the surrounding. Here, the district court, in denying the motion to dismiss, said that we need further factual development, but why can't we just accept all the allegations in your complaint as true and then decide as a matter of law whether that amounts to a substantive due process violation? Why can't we do that? Because, Your Honor, functionally, a ruling in our favor would do that. I mean, it would be a decision as to whether it amounts to it and whether we've alleged it, but the particular—Yahn and Cutlip, for example, those were decided on fact-specific issues and at the summary judgment stage, and the facts mattered. The court looked at the facts, the culpability of the defendant's conduct, for example, whether they actually took affirmative acts that placed the decedent in a worse place than they would have otherwise been. Okay. I mean, you know all those facts, and you've alleged all those things. We know many of them. What facts don't you know that you need further discovery on? Well, the court's asked several times about the individual defendant's subjective knowledge of the decedent's disability, for example. Oh, okay. That's one of them. So if that were to change the result of the case, that would be material? It would, Your Honor, in that instance. What else would be material that might come out in discovery? I think that more factual detail on the specific conversation that was had there, because it goes to the conscious shocking standard and the deliberate indifference standard, we have a lot already on deliberate indifference. For example, the fact that the defendant omitted the fact that he was, Defendant Labish omitted the fact that he had had this interrogation when he wrote his report of the incident two days later following Joey's death. That seems to suggest an intent not to be forthcoming about what had occurred, which seems to suggest knowledge of wrongdoing. Okay. All right. Thank you, Your Honors. Anything further? Judge Gold? Thank you. All right. Two minutes for rebuttal. Ms. Haisland. Thank you, Your Honors. I want to hit three items. First on the clearly established test. Clearly established cannot be established through dicta distinguishing outlier cases, or circuits, other circuits outlier cases. And Wilson, which was post-John, reiterated that our circuit does not extend state-created danger to noncustodial suicides. Second, Your Honors pointed out that we cannot impute knowledge to others. Actually say does not or has not. I mean, I think. I might say has not. I'm not sure. At this point, has not, as of Wilson. We can't impute knowledge to people, but we can look at Bukowski and what they knew there about that plaintiff having a cognitive disability, and regardless, as a matter of law, that was not a conscious shocking conduct to return that 19-year-old to her abuser. And we can look. And if we're looking at what is alleged and known, and this isn't imputed to Ahrens, but it looks like Deputy Labash did discipline the student in May 2018 with no incident thereafter. And also, opposing counsel distinguishes John because he admitted to a crime. Here, he alleges an incident, but I would contend that this is artful pleading. Information and belief pleading is insufficient for matters within the pleader's personal knowledge. And that's why we attached the police report to our 12C motion, Your Honors, because that police report is personal knowledge of the plaintiffs. And they knew exactly what happened, that he punched somebody because that was part of the telephone conversations he had with both parents. And he talked to both parents and his grandmother in between coming home and the unfortunate suicide later on. And ultimately, he was not criminally charged, but in Michigan, it is a crime to punch somebody else and engage in those kinds of acts. But he was only suspended for three days, and that's not conscious shocking under this standard. If the court has no further questions. All right, thank you for your arguments, counsel. Thank you. The case will be submitted.